**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Joseph A. KRASNOV, Samuel Krasnov, Seymour Krasnov, The Comfy Manufacturing Company, Fred E. Katzner and Arthur Oppenheimer, Jr., Defendants.**

**Civ. A. No. 11024.**

United States District Court
E. D. Pennsylvania.
July 30, 1956.

See also 109 F.Supp. 143.

William L. Maher, Joseph F. Tubridy, Morton M. Fine, Sp. Assts. to Atty. Gen., for plaintiff.

C. Brewster Rhoads, Joseph W. Swain, Jr., Leonard L. Kalish, Philadelphia, Pa., for defendants Joseph A. Krasnov, Samuel Krasnov, Seymour Krasnov.

Nochem S. Winnet, Milton M. Gottesman, Daniel Lowenthal, Philadelphia, Pa., for defendants The Comfy Mfg. Co., Fred E. Katzner.

Fred A. Klein, New York City, for defendant Arthur Oppenheimer, Jr.

CLARY, District Judge.

This is an action under Section 4 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 4, brought by the United States against the above six defendants for alleged violations of Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat.

209, as amended 15 U.S.C.A. § 1 and § 2. The complaint charges the defendants to be engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in the manufacture and sale of ready-made furniture slip covers among the several states of the United States; a combination and conspiracy to monopolize the aforesaid trade and commerce; an attempt to monopolize and a monopoly. The United States seeks an injunction to restrain the said six defendants from a continuance or revival of the alleged illegal practices and activities. The matter before the Court is plaintiff's motion for summary judgment.

Three of the defendants, Joseph A. Krasnov, Samuel Krasnov and Seymour Krasnov, are copartners in the business of manufacturing and selling ready-made furniture slip covers, doing business under the trade name of Sure-Fit Products Co., with their principal place of business at Bethlehem, Pennsylvania. Hereinafter these defendants shall be referred to collectively as "Sure-Fit". The fourth defendant, The Comfy Manufacturing Company, hereinafter referred to as "Comfy", also in the business of manufacturing and selling ready-made slip covers, is a Maryland corporation, with its principal place of business in Baltimore, Maryland. The fifth defendant, Fred E. Katzner, is a resident of New York City and at the time covered by the complaint was President of Comfy and as such was actively engaged in the management, direction and control of the affairs and policies of said corporation. The sixth defendant, Arthur Oppenheimer, Jr., is a resident of Boise, Idaho, and is the patentee of U. S. Letters Patent No. 2,100,868, which patent pertains to the manufacture of ready-made furniture slip covers from knitted fabrics.

The subject matter of this action is ready-made slip covers. There are generally four types of ready-made furniture slip covers: woven fabric, woven fabric containing rubber thread, knitted fabric, and knitted fabric containing rubber thread. Such slip covers are completely manufactured at the factory in a number of basic styles adjustable for use on most sizes and shapes of upholstered chairs and sofas in common usage throughout the United States. They are so designed that they may be installed by the user following simple directions without professional guidance. They are distinguished from so-called "custom made" slip covers which are tailored for individual items of upholstered furniture by skilled professional workers who in many cases measure, cut, fit and install such covers in the home of the purchaser. When used hereinafter, the term "slip cover" shall refer to ready-made furniture slip covers.

The Pleadings

The Government alleges that since at least 1937 defendants Sure-Fit and Comfy have been the two largest manufacturers of slip covers in the United States; that in 1949 said defendants manufactured approximately 62 per cent of all slip covers manufactured in the United States; and that thirteen other manufacturers accounted for the remaining 38 per cent, of which the defendants' largest competitor accounted for only 9 per cent of the total slip covers manufactured; that during 1949 more than twenty-three million dollars worth of ready-made furniture slip covers of all types were produced in the United States; and that Sure-Fit and Comfy manufactured this pro rata percentage share of said slip covers in their factories in Baltimore, Maryland, and Bethlehem, Pennsylvania, respectively, and sold said slip covers in interstate commerce. Further, that some time in 1938, Oppenheimer transferred his title to U. S. Letters Patent No. 2,-100,868 to Comfy but retained a reversionary interest therein as well as rights to royalties on slip covers manufactured thereunder.

The alleged conspiracy to evade the Sherman Act is claimed to have commenced in 1939 when, with the knowledge and consent of Oppenheimer, Comfy and Sure-Fit entered into an agreement whereby:

(a) Comfy would license Sure-Fit to manufacture and sell slip covers under the Oppenheimer patent, and Sure-Fit would cross license Comfy to manufacture and sell, to a limited number of customers, slip covers embodying the invention claimed in U. S. Letters Patent No. 1,984,973, which patent was owned by Sure-Fit;

(b) Comfy would not grant licenses to others under the Oppenheimer patent without Sure-Fit's consent;

(c) Comfy was to set the price to be maintained for slip covers manufactured under the Oppenheimer patent, and

(d) The defendants would share the expense resulting from litigation brought against alleged infringers of the Oppenheimer patent.

Further, that subsequent to said agreement, the defendants embarked on a plan whereby Comfy would threaten to institute, and institute, patent infringement suits against retail dealers selling slip covers of competitors, alleging the sale of merchandise infringing on the Oppenheimer patent. That following the institution of such suits, the defendants would endeavor to settle the suits by requiring the retailer to discontinue the sale of alleged infringing slip covers and substitute therefor slip covers manufactured by the defendants.

Finally, the complaint alleges that the defendants would injure and destroy competition of other manufacturers by:

(a) Purchasing slip covers of competitors from retailers in exchange for "full line orders" of defendants' slip covers;

(b) Reselling the merchandise of the competitors to other retail outlets at a price less than wholesale, thereby disrupting the market for their competitors and creating the impression among retailers and consumers that such slip covers were of inferior quality and workmanship;

(c) Granting special discounts, excessive advertising allowances, and abnormal return privileges to retailers who agreed to carry their merchandise exclusively, and

(d) Making or causing to be made derogatory and disparaging statements concerning their competitors' merchandise and their financial ability to defend the retailer against infringement suits which might be brought against the retailer by the defendants.

The Government alleges that the defendants combined and conspired to do these things and that said combination and conspiracy has directly and substantially been an unreasonable restraint on interstate trade and commerce in slip covers and has assured the defendants a dominant position in the manufacturing and distribution of slip covers.

The defendants have filed separate answers in which each defendant generally denies the charges made by the Government. Whether the denial runs to facts, as contrasted to the denial of inferences drawn by the Government from facts or documents which are otherwise admitted, is a point which will be discussed later in this opinion.

### The Contentions

The Government contends that it is entitled to summary judgment because the agreement entered into by Comfy and Sure-Fit was designed to eliminate competition and was inherently illegal for the following reasons:

(1) The parties agreed to pool their patents and to act jointly in prosecuting patent infringement suits which they never intended to allow to be adjudicated;

(2) The parties agreed to relinquish their individual rights to license others and acted jointly in approving or disapproving the applications for licenses;

(3) The parties agreed to price fixing, and

(4) The parties acted together to create market conditions which would eliminate competition.

In support of its allegations the Government has filed, as part of an affidavit in support of its motion, a compilation of documents consisting of 945 pages, con-

taining 504 exhibits. Without exception, these exhibits have come from either the files of one of the defendants, their attorneys, or from the court records of patent infringement suits to which one of the defendants was a party. Except for 14 scattered documents, the authenticity of all of the Government's exhibits has been admitted by at least one of the defendants. Allowing these documents to speak for themselves, the Government contends that these writings establish undisputed facts which prove the essential elements of the complaint and that the legal consequences to be drawn from the facts as established by the documents is the only dispute raised by the defendants' answers or counter-affidavits.

The defendants argue that this Court cannot properly grant summary judgment for the following reasons:

(1) That the Government's motion does not comply with Rule 7(b) (1) of the Federal Rules of Civil Procedure, 28 U.S. C.

(2) That the Government's motion does not comply with Rule 56(c) of the Federal Rules of Civil Procedure, and

(3) That by granting this motion the Court would be depriving the defendants from establishing—by way of defense—the following facts:

(a) "The dollar-rates figure tendered by plaintiff's affidavits shows that there was no monopoly or attempt to monopolize."

(b) That there has been "freedom of entry into the slip cover market",

(c) That "the defendants did not have the power to control the market price",

(d) That "the share of the market had by the defendants was a result of consumer demand", and

(e) That "any patent infringement suits threatened or brought by the defendants against retailers and manufacturers were not threatened or brought for the purpose of harassing competitors."

The contentions of both parties will be discussed later under the heading of Discussion.

## The Facts

The following statement of facts is made in the light of the provisions of Rule 56(c) of the Federal Rules of Civil Procedure. They are to be found in the written agreements between the respective parties; in admissions in the pleadings in this action; in the sworn complaints or answers in infringement suits instituted by defendants in this and other courts, and in documents, the authenticity of which have been admitted by one or all of the defendants, obtained from the files of the defendants or their attorneys, which documents include correspondence between the defendants themselves and between the respective attorneys for the various defendants, interoffice memoranda of the defendants, vouchers and bills of the defendants, and correspondence by the defendants with retailers.

■■ Because of objections by the defendants to the consideration of the various documents outlined above in the motion for summary judgment, pre-trial procedures were availed of to determine which of the exhibits were relevant and admissible. At these hearings the Court determined that all of the documents were relevant and admissible, with minor exceptions. (These latter documents were not referred to in determining the facts.) The most serious of the objections related to the claim of privilege interposed with respect to communications between client and attorney. It was the thought of one of the attorneys that he had preserved the right of privilege for both himself and his client. Since the documents as to which such claim was made had been presented to a Grand Jury, upon a duly issued subpoena, the Court itself examined the Grand Jury minutes and determined that the documents relied upon by the Government were presented without any claim of privilege and that the record of the Grand Jury proceeding reveals that what the attorney considered to be privileged communications were removed from the file without objection by the Government and the files then presented to the Grand Jury. The Court,

therefore, determines that the claim of privilege in this case is without foundation and overrules it. As to the other documents relied upon by the Government, all of which were presented without claim of privilege, any attempt now to invoke the claim cannot be considered. The privilege once waived cannot be regained; Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344. The Court, therefore, determines that there is no genuine issue as to any material fact or any of the inferences which are drawn from the facts outlined below and the documentary evidence attached to, and made part of, the Government's affidavit.

Sometime prior to October 25, 1937, Arthur Oppenheimer, Jr., described by his counsel as a young man of limited financial resources, filed a patent application pertaining to the manufacture of ready-made furniture slip covers from knitted fabrics with the United States Patent Office. On October 25, 1937, while said application was pending, Oppenheimer and Comfy entered into an agreement wherein Oppenheimer assigned his rights and title to the application itself and any letters patent issued thereunder to Comfy. By the terms of the agreement, Comfy was to pay Oppenheimer a royalty of five cents for each chair and ten cents for each davenport cover manufactured and sold. In the event that Comfy did not make and sell 50,000 slip covers in any given year, Oppenheimer had the right to demand reassignment of the application or, thereafter, the patent. Comfy agreed not to sell or encumber the patent in any way and to diligently protect the patent at its own expense. In the event Comfy recovered damages from infringers it was to pay Oppenheimer 25% of the recovery; in the event that the patent was judicially declared to be invalid, Comfy was relieved from paying any future royalties. Paragraph 11 of the Agreement granted Comfy the right to grant nonexclusive licenses to others. On November 30, 1937, Oppenheimer was granted Patent No. 2,100,868 on the aforesaid application. By assignment, dated January 17, 1938, Oppenheimer again "assigned" all his rights, title and interests in and to Letters Patent No. 2,100,868 to Comfy Manufacturing Company for the stated consideration of One Dollar. This instrument was recorded in the United States Patent Office.

While the Oppenheimer application was pending, one Walter L. Fry was granted a patent which incorporated substantially the same improvements claimed in the Oppenheimer application. Fry's patent was issued on November 2, 1937, twenty-eight days before Oppenheimer's. Shortly after the issuance of the Fry and Oppenheimer patents, Comfy and Fry issued a joint statement notifying the trade of the issuance of the patents and stating that they had exclusive rights to manufacture and sell slip covers made of knitted fabric as covered by said patents. Thereafter, the Fry patent and any question of its validity disappears from the scene until some three years later, when, as will hereinafter be set forth, it reappears in what will be called the "Rosner case".

When allegedly infringing merchandise appeared on the market, Comfy faced the difficulty of adopting a policy to protect the Oppenheimer patent. Comfy decided the least dangerous method would be to sue retail stores and it thereupon adopted the policy of starting infringement suits against a retailer only and demanding, as the condition for settlement, discontinuance of the sale of competitor's goods. Discontinuance of the sale of competitor's goods would mean, of course, the adoption of the Comfy line, if the retailer was to carry knitted fabric slip covers.

In accordance with this plan of procedure, on April 7, 1938, Comfy started a suit against Hecht's of New York charging it with the sale of merchandise infringing the Oppenheimer patent; the complaint prayed for an injunction, damages and costs. Hecht was then carrying the Sure-Fit line. Hecht agreed to discontinue the sale of Sure-Fit products and the suit was discontinued on April 27, 1938, without damages or costs.

Comfy requested that Hecht send it the following letter:

"Our attorney has reported to us that he has arranged with your attorney to discontinue the suit brought against us charging infringement of Oppenheimer's Patent covering the sale of Knitted Slip Covers. When the papers were served on us, we investigated the matter and determined that we did not wish to handle infringing merchandise. We accordingly withdrew such infringing Slip Covers from sale immediately, and do not intend to handle them in the future. We wish to thank you for the courtesy in which you handled the situation."

because "such a letter would be of great benefit to us". Hecht complied in substance. Comfy notified retailers carrying competitors' merchandise of the filing of its suits with the intention of later circularizing the trade with letters such as the Hecht letter, or parts of them, for the purpose of discouraging retailers from carrying competing lines. Comfy was not as successful with a similar suit brought by it against Hutzler Brothers in the District Court of Maryland. Hutzler Brothers refused to sign a stipulation recognizing the validity of the Oppenheimer patent and admitting the charge that the merchandise they were handling infringed on said patent. They even refused to agree not to purchase competitors' slip covers in the future, although they did place an order for the Comfy line. The case came up for trial and the Court refused to extend the time for trial beyond March 1, 1939. Considering the whole situation "right ticklish", Comfy had the suit dismissed, even though it gained nothing; it cannot be said that the case was "settled"; Comfy had the suit dismissed because it did not want to go to trial.

At about this time Sure-Fit requested its attorney to make a complete study of the Oppenheimer patent; and, after such a study, they were informed that there was no possibility of the Oppenheimer patent being sustained in an adequately

contested suit. Sure-Fit, being the manufacturer, waited for Comfy to sue and assert the infringement claim lodged against retailers. When Comfy did not sue and Sure-Fit found its customers receiving notices of infringement and being threatened with suit, it started suit against Comfy on January 9, 1938, in the Southern District of New York, seeking to have the Oppenheimer patent declared invalid and charging Comfy with unfair competition and violation of the Antitrust Laws. On October 4, 1938, Comfy and Sure-Fit, with Oppenheimer's approval, entered into an agreement, the basic document of this conspiracy; certain provisions of which the Government alleges to be in violation of the Antitrust Laws. The Sure-Fit-Comfy suit was discontinued by stipulation of counsel three days later, October 7, 1938.

The agreement of October 4, 1938, contained twenty-five numbered paragraphs, many of which will be discussed in greater detail later in this opinion. Generally, the agreement provided as follows: Comfy granted Sure-Fit a nonexclusive license to make, use and sell slip covers under the Oppenheimer patent for a royalty of five cents on each chair and ten cents on each sofa manufactured and delivered by Sure-Fit. (Oppenheimer had meanwhile agreed to lower his royalty rates to Comfy.) Comfy covenanted not to license any other slip cover manufacturer *without the consent of Sure-Fit*. The agreement provided for *joint determination* in instituting infringement suits and the sharing of expenses for this purpose equally. Sure-Fit in turn cross-licensed Comfy to make, use and sell, to a limited number of customers, slip covers covered by Patent No. 1,984,973, which patent was owned by Sure-Fit. The parties also agreed to *maintain prices* which were established by Comfy and attached to the agreement in a separate schedule, Comfy had the right to revise the schedule at its option. Comfy was to send letter notices of the licensing to every person and corporation that had been notified by Comfy of Comfy's ownership of the Oppenheimer patent. Oppenheim-

er approved the licensing agreement "in consideration of the potential benefits and advantages which said agreement represents to (him)". The Agreement was signed by Oppenheimer. All of the parties, Comfy, Sure-Fit and Oppenheimer, entered into this agreement at a time when the question of the validity of the Oppenheimer patent had not been determined and, in fact, after all parties concerned had clearly agreed never to permit judicial determination of its validity, as reflected by a subsequent and continuous course of action.

The motivation for this agreement can best be summarized by the often quoted remark "If you can't beat them, join them". Comfy wanted to avoid any possibility of testing the validity of the Oppenheimer patent; Sure-Fit had lost Hecht's and would undoubtedly lose a number of other customers who were being threatened with infringement suits. A Chicago account of Sure-Fit, Goldblatts, was already being sued by Comfy and for jurisdictional purpose Sure-Fit felt it best not to defend for Goldblatts. If these two manufacturers were to enter into an agreement whereby each would be assured that it could keep its present accounts without fear of competition from the other and, if by joint force, they could venture into the trade with threats of infringement suits against customers of competitors, their mutual and individual interests would be served. The alternatives offered by adjudication of the Sure-Fit-Comfy suit were of no particular advantage to Sure-Fit and they were somewhat frightening to Comfy. Comfy would gain all or lose all, and here the certainty of Sure-Fit's attorney as to the invalidity of the Oppenheimer patent must not be minimized; Sure-Fit would, at best, create a wide open field if it were successful. That a deliberate division of the trade was intended (and achieved) by the defendants is proved by a letter written in August of 1940 by Comfy to Fred A. Klein, Esquire, its attorney, wherein Comfy complained that Sure-Fit had crossed the line and offered a price reduction to one of Comfy's customers. Comfy wrote that while violations as to price reduction, directly and indirectly, existed from the first, these violations were not offensive and had not been made "an issue" because they were "confined mostly to Sure-Fit's own customers". The retail price was being maintained despite these violations and Comfy felt that "no real harm was being done by such violations". Further, Comfy wrote that it also found it necessary to deviate as to prices from time to time among its own customers but felt that if they were to encroach upon each other's accounts then there was "no purpose" in continuing the agreement. To correct this breach, which occurred nearly two years after the signing of the agreement, it was suggested that "the best solution would be a verbal reaffirmation of the purposes of the agreement. We must both understand and agree that an occasional reduction in price or other inducement may be necessary because of some local situation or competition with nonlicensed manufacturers. However, we must definitely understand each other that we cannot approach each other's accounts with inducements".

After the defendants entered into the agreement, they followed the above course as to each other's customers, they joined in policing and checking the trade, they were in constant contact with each other, and they would inform each other of any price violation which came to their attention. They jointly informed the trade of Sure-Fit's licensing by sending out two separate mailings of 1,836 letters each. Comfy sent a letter to Amerling & Angello, Esquires, attorneys for Hecht Bros., informing them of Sure-Fit's license and inviting them to return to Sure-Fit: "In view of this license, Hecht Bros. is at liberty to purchase such slip covers from Sure-Fit Products Company."

Comfy and Sure-Fit circularized the trade generally and sent letters to individual retailers selling competitors' merchandise, threatening them with suit unless they discontinued the sale of such merchandise. They recognized and took

full advantage of the almost universal aversion of a retailer to patent litigation and their suits were brought for the purpose of having the retailer discontinue a competitor's line and adopt theirs; they had no interest or intention of adjudicating the validity of the Oppenheimer patent. They sought consent decrees from stores which could be represented as acknowledgment or adjudication of the validity of the Oppenheimer patent. Letter agreements not to handle competitors' products were accepted from a retailer and the suit was then discontinued. When the retailer would handle such merchandise again, the defendants sued on the letter agreements rather than for infringement. In general, the pattern of the Hecht and Hutzler suits was followed.

Ten suits were instituted against retailers without the validity of the Oppenheimer patent ever being adjudicated. The defendants tolerated continuous alleged violations of the Oppenheimer patent despite the fact that an adjudication of its validity would have been a complete answer to their problem. They never collected damages for past alleged violations and they never collected expenses for any of their suits from retailers. Their gain was the addition of another customer at the expense of some other manufacturer.

Four suits were instituted against manufacturers directly. The first was against Med-Vogue Corporation in the Southern District of New York. This suit was started by Comfy on October 13, 1938, just nine days after the agreement between Comfy and Sure-Fit was reduced to writing and signed. Med-Vogue filed an answer and a counterclaim in which it asserted that the Oppenheimer patent was invalid for various reasons, that the suit was instituted solely for harassing purposes, and that Comfy, Sure-Fit and Oppenheimer, knowing that the Oppenheimer patent was not valid, entered into an agreement for the purpose of threatening and intimidating retailers with the effect, and for the purpose, of deterring and preventing them from purchasing Med-Vogue covers. Comfy alone was the plaintiff in the suit;

Med-Vogue's counterclaim included Sure-Fit. The suit and counterclaim were discontinued on June 7, 1939, after an agreement had been entered into by the parties. The agreement provided that Med-Vogue would discontinue the sale of knitted slip covers, that the respective rights of both parties to manufacture woven slip covers would remain unchanged, that Med-Vogue was released from liability for any possible past infringements, and that Comfy would purchase Med-Vogue's inventory and machinery for $8,309.36, plus $1,500 for finished slip covers on hand. This "settlement" cost the defendants nearly $10,000; $500 was contributed by Oppenheimer and the balance was borne equally by Comfy and Sure-Fit.

The second suit against a manufacturer, Vatco Manufacturing Company, was instituted in January, 1939. It was brought about by a combination of circumstances which left Comfy no alternative but to institute suit. Comfy circularized Vatco's customers with infringement notices and threats of suit. Vatco, by letter dated October 21, 1938, wrote Comfy that it believed the Oppenheimer patent to be invalid and it invited Comfy to sue for infringement. When, by early December, Comfy did not institute suit, Vatco circularized the trade, advising that it believed Patent No. 2,-100,868 to be invalid, that it had sent a registered letter to Comfy calling upon Comfy to sue Vatco, that no suit had been brought, that Comfy's circular was for the mere purpose of intimidating the retailer and that Vatco would, upon request, give any of its customers a letter guaranteeing the customer against all actions for infringement of the Oppenheimer patent. Vatco also referred to its financial standing as a guarantee of its strength. This case was settled by an agreement wherein Vatco was to pay Comfy a certain amount of money, and Comfy was to stop sending circular letters to Vatco's customers, was not to sue Vatco or its customers for infringement, unless the patent was first adjudicated, and it was to send a notice to Vatco of

any suits started involving infringement of the Oppenheimer patent. Vatco's future was then clear except for the possibility that the patent would be adjudicated to be valid, in which event it would find itself liable for all damages from the date of the agreement.

The third suit against a manufacturer was brought in June, 1941, against the Malden Novelty Co., Inc. Service was quashed for want of jurisdiction and the defendants never attempted to reinstate the action.

The fourth suit instituted against a manufacturer had some unforeseen results. The financial strength of Dyer-Gruen-Jackson, Inc., was carefully checked and when it was found that it was weak and, in fact, almost out of business, it was decided to institute suit against that company. The complaint was filed on June 18, 1941, in this Court and Dyer-Gruen-Jackson, Inc., answered. Then, to the surprise of the defendants, Louis Rosner moved to intervene as a defendant in the action. The motion alleged that Rosner, doing business under the trade name of Franklin Cushion and Drapery Company, was engaged in the manufacture of slip covers, as a sublicensee of Dyer-Gruen-Jackson, Inc., under the Fry patent referred to above, and that Dyer-Gruen-Jackson, Inc., itself was no longer manufacturing slip covers. The court granted the motion and Rosner was made the defendant. Rosner filed an answer and counterclaim; Comfy moved to strike the counterclaim, and Rosner moved for summary judgment. With Oppenheimer's and Sure-Fit's approval, an agreement was entered into between Comfy and Rosner, on Rosner's terms. Rosner received a substantial sum in settlement and he received a license under the Oppenheimer patent. By the terms of the agreement, Rosner was granted a non-exclusive license; he was exempt from paying royalties on knitted slip covers of the type he had been manufacturing and as to other types of knitted slip covers he was to pay a flat 2% royalty on the net selling price of each unit, but no royalties were due for the first $37,500 of net sales annually. The royalties received from Rosner were divided in equal thirds by Comfy, Sure-Fit and Oppenheimer, and Sure-Fit's royalties were substantially reduced. Settlement of this suit constituted a total loss at great expense to Comfy, Oppenheimer and Sure-Fit, despite the fact that the latter had its own royalties reduced. Adjudication of the validity of the Oppenheimer patent was avoided, however.

Comfy instituted suits against Gimbel Brothers, A. I. Namm & Sons, Selrite, Inc., Mandel Brothers, Inc., C. F. Hovey Company, Frank and Seder, and three suits against Lit Brothers, all retailers. Generally the effect of these suits was to force the retailers to discontinue purchase of competing lines. Those cases in which the retail defendant showed any aggressiveness in the defense, the suit was discontinued for lack of prosecution. In no case was there any adjudication on the merits. The result of the present defendants' suits against defendant retailers, carefully chosen by them, was calculated to and did extend their dominion in the slip cover field.

## Discussion

Before venturing into the vast number of arguments advanced by both sides on the merits of this case, it would be well to dispose of the two procedural arguments advanced by defendants.

The first is defendants' contention that the motion for summary judgment must be denied for lack of compliance with Rule 7(b) (1) of the Federal Rules of Civil Procedure. Rule 7(b) (1) provides as follows:

"(b) *Motions and Other Papers*

"(1) An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, *shall state with particularity the grounds therefor,* and shall set forth the relief or order sought. * * *" (Emphasis supplied.)

Defendants contend that the Government's motion does not set forth the grounds upon which it seeks summary

relief. With this I cannot agree. I do not consider this rule to establish a mere technical requirement but rather hold it to be "real and substantial." Steingut v. National City Bank of New York, D.C. N.D.N.Y.1941, 36 F.Supp. 486. A reading of the motion, however, can leave no doubt as to the theory upon which plaintiff is proceeding. After listing the pleadings and papers upon which the Government relies the motion "moves the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment". Rule 56 completely sets forth the procedure and basis for granting summary judgment in Federal practice. When a motion is so explicit, the grounds therefore have been set forth with particularity within the meaning of Rule 7(b) (1) of the Federal Rules of Civil Procedure. Galdi v. Jones, 2 Cir., 1944, 141 F.2d 984.

As to the second procedural point, the principal argument advanced by the defendants is twofold. First, that on the present record, the case is not susceptible of disposition on motion for summary judgment, and, secondly, that the plaintiff's affidavits and exhibits thereto create genuine issues of material fact which compel denial of its motion for summary judgment. Great reliance has been placed upon the decision of the United States Court of Appeals for this Circuit in Frederick Hart & Co. v. Recordgraph Corporation, 1948, 169 F.2d 580. In that case the court held that affidavits filed in support of motions for summary judgment may be considered for the purpose of ascertaining whether an issue of fact is present but that they cannot be used as a basis for deciding the fact issue.

■ I do not see the applicability of the Frederick Hart case to the situation which confronts the Court in this case. The Government has established by the introduction of *documentary evidence* all of the facts necessary to establish its case. The correctness and authenticity of each document, which cover some 945 written pages, have been admitted by at least one of the defendants involved in this action. That there was a combination between the parties cannot be gainsaid. Their admitted formal written agreements establish that and no party has attempted to challenge them. The documents cover the entire period of operation, were made concurrently with the events which they purport to portray and, since they are *genuine documents,* no issue of fact can arise with respect to any particular document which might in anywise cast doubt upon or weaken the effect of other documents. The United States Court of Appeals for this Circuit has approved the use of documentary evidence in determining affirmative facts necessary to the decision of a matter and has upheld the use of such documentary evidence in taking a case away from the jury; Croll v. John Hancock Mutual Life Insurance Co., 1952, 198 F.2d 562. The Supreme Court of the United States in Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013, has likewise approved the use of documentary evidence in motions for summary judgment in Antitrust cases. In the case of Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363, the Supreme Court affirmed the action of the District Court in granting defendant's motion for summary judgment on the basis of facts which had come before it clearly evidencing lack of merit in plaintiff's contention. It appears, therefore, that the doctrine of the Frederick Hart case, supra, is no bar to summary judgment in this case, if the undisputed documents show a conspiracy to restrain trade and monopoly, acts done in accordance with the conspiracy and harmful effects upon trade in the particular industry. That all of these requirements are met in this case will appear clearly as the opinion progresses.

The further objection that these documents might not be admissible in evidence has also been carefully considered by the Court. As before stated, the only objection which gave the Court any difficulty went to the question of privilege. That objection of the defendants has been resolved in favor of the Government.

There has been no violation of privilege in this case. Further, communications with third parties, as contrasted to those between the various defendants, are clearly relevant and admissible. Once having established the fact of conspiracy any writings of the parties in furtherance of the conspiracy, whether between themselves or third parties, are relevant and admissible against all of the defendants. I, therefore, have no difficulty in concluding that all of the documents are relevant and admissible and all will be used, except as otherwise noted above, in the determination of this issue.

■■■■ The next question to be determined is whether or not this matter is one to be appropriately disposed of by summary judgment. There can be no doubt that summary judgments are as applicable to actions under the Sherman Act as they are to any other type of actions, legal or equitable. Associated Press v: United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; United States v. United States Gypsum Co., 1950, 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89. Under Rule 56 (c) of the Federal Rules of Civil Procedure a motion for summary judgment may be granted only

" * * * if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law."

Thus, in the matter before the Court, I may grant the Government's motion and enter judgment in its favor if: (1) All of the pleadings, affidavits and exhibits show that there is no genuine issue of fact whatsoever existing between the parties, any dispute between them going only to the legal significance to be given to such facts, or (2) since the complaint sets forth a number of allegations, any one of which, standing alone, would warrant a finding that defendants have violated the provisons of the Sherman Act. I may likewise determine whether the documentary evidence clearly supports the alleged "per se" violations of the Antitrust laws.

### Price-Fixing

The Government has charged that the defendants' agreement and conduct in relation to price-fixing was, from the beginning, illegal per se, citing a number of cases in support of its contention. The Court will limit its consideration to the main argument which develops from the language in United States v. General Electric Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408, and United States v. Line Material Co., 1948, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701. The defendants also place great reliance upon United States v. General Electric Co., supra. That case involved an agreement between General Electric and the Westinghouse Company through which Westinghouse was licensed to manufacture incandescent light bulbs under a number of General Electric's patents, on condition that it should sell said bulbs at prices fixed by General Electric. The price agreement was upheld as a valid exercise of patent rights. The court said [272 U.S. 476, 47 S.Ct. 197]:

"When the patentee licenses another to make and vend and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent but not so as to destroy the profit that I wish to obtain by making them and selling them myself.' "

As in the instant case, the General Electric case has often been cited as authority to support diametrically opposing contentions.

■ In United States v. Line Material Co., supra, Mr. Justice Reed devoted some time to a consideration of the General Electric case, but refused to define its limits or interpret the basis for its rule. His stated reasons for not doing so was that a majority of the court could not agree on the basis for affirming its rule, nor was there a majority to overrule it. The Line Material Co. case still left undecided "the many variables of the General Electric [case] that may arise." [333 U.S. 287, 68 S.Ct. 559.] One of these variables is presently before the Court. Quoting Mr. Justice Reed:

"Where a conspiracy to restrain trade or an effort to monopolize is *not* involved, [the General Electric case holds that] a patentee may license another to make and vend the patented device with a provision that the licensee's sale price shall be fixed by the patentee."

I need not decide this variable, however; the conduct of the defendants pursuant to the agreement renders it unnecessary. The price arrangement was not executed in a manner so that its purpose can be said to have been the protection of the patentee's monopoly with, of course, the necessary incidental benefits accruing to the licensee; but rather it was used as a two-edged implement to cut equally for the benefit of both the licensor and licensee. Comfy complained to Sure-Fit when one of the latter's customers failed to maintain the retail price and Sure-Fit sent out a salesman to adjust the matter; Sure-Fit in like manner and with apparent equal right watched Comfy's customers. It complained about Gimbels, Strawbridge and Clothier, and Goldblatt's. Comfy replied to the complaints and assured Sure-Fit that it would take steps to adjust these matters, and thereafter Comfy kept Sure-Fit advised of its progress along these lines. They each had an interest in maintaining a set retail price and they each took action towards that end. The agreement operated equally for the benefit of the patentee and the licensee and does not fall within the rule of the General Electric case, as such. There is no question that the agreement potentially tended to eliminate competition and was an unreasonable restraint on trade within the meaning of the Sherman Anti-Trust Act.

■ The Government has also shown the power of the defendants to control prices in this particular field and how it was accomplished. It would be extremely difficult for the defendants ever to argue in view of a letter dated August 11, 1949, defendant Katzner wrote to Sure-Fit (Government Exhibit 502) that no such power existed. Part of the letter reads as follows:

"*One* of the major benefits derived from the patent has been the fact that it has been completely respected by Sears and Wards, and we have enjoyed an excellent volume of business with these mail-order houses. On numerous occasions, *competitors have offered them infringing covers at prices much lower than ours.* However, because it is the definite policy of these two firms to respect patent rights, such offerings have been rejected." (Italics supplied.)

That the defendants actually fixed and maintained prices is clearly evidenced by documentary exhibits showing that where retailers such as Strawbridge and Clothier and Gimbels, large department stores in Philadelphia and vicinity, were selling products of one of the two defendant companies at lower prices than had been agreed upon, the attention of the respective manufacturer was called to this situation and each in turn not only agreed to but did bring the retail level back to the agreed prices. The patently illegal price feature of the program, it is true, was cancelled in 1942, but the documentary evidence in the case clearly demonstrates that while cancelled as a formal provision of the contract, it was, in fact, followed in practice. The few times that the deviation from agreed prices occurred demonstrates clearly that each of the defendant companies was extremely solicitous to see that retail prices were maintained at agreed levels.

### Cross-Licensing

Next, the Government contends that it is entitled to summary judgment because of the illegality of the cross-licensing agreement of Comfy and Sure-Fit. The defendants argue that cross-licensing is permissible under the holding of Standard Oil Co. v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 423, 75 L.Ed. 926, the leading case on patent pooling and cross-licensing. Prior to the Standard Oil decision, the case law was hopelessly confused and divided along two lines: One, emphasizing the narrow exception of the "legal monopoly" granted by patent law, and the other emphasizing the prohibition of "unlawful restraint" imposed by Antitrust law. Mr. Justice Brandeis established the rule that a pooling arrangement or cross-licensing between competitors is not illegal in and of itself, but that it may become illegal if it is part of a larger plan to control interstate markets, stating

> "Such contracts must be scrutinized to ascertain whether the restraints imposed are regulations reasonable under the *circumstances*, or whether their *effect* is to suppress or unduly restrict competition."

Here, the defendants were the two largest competitors in the industry and dominated it dollar-wise. They fixed and maintained prices, they controlled the key patents in the industry, they shared the cost of infringement suits, and neither granted rights under the said patents to any third parties until they found it necessary to do so, at which time they did so by mutual consent in accordance with their agreement. Under these circumstances I think the defendants were well beyond the protection afforded by patent grants. I need not determine cause and effect as between the *agreement* and the *circumstances;* it is sufficient to note that their combined effect was to stifle competition.

### Right to Jointly Determine Maintenance of Infringement Suits

The Government alleges that two other provisions of the licensing agreement between Comfy and Sure-Fit render it illegal. It is the Government's position that Paragraph 11 of the Agreement grants Sure-Fit the right to prohibit Comfy from licensing others and that Paragraph 6 provides for joint determination in instituting infringement suits and that such a grant and provision are illegal because they establish an effective means by which the defendants could restrain trade in violation of the Antitrust laws. The defendants answer that these provisions of the licensing agreement are sanctioned under Patent law and that, as such, they are immune from the Antitrust laws. These provisions are treated separately in the Government's briefs and are answered accordingly by the defendants. Because of their interrelation I shall consider the two together.

Paragraph 11 reads:

> "The Licensor (Comfy) covenants and agrees that it will not grant unto others any right or license, expressed or implied, under the said (Oppenheimer) Letters Patent as long as the Licensee (Sure-Fit) holds this license, nor will Licensor sell such slip covers to slip cover manufacturers."

Paragraph 6 reads:

> "Should infringements of the said Oppenheimer patent appear in the market, the Licensor and Licensee shall jointly determine whether or not suit shall be instituted. All disbursements, costs and expenses in connection with such suits shall be subject to the joint determination of the Licensor and Licensee and all such disbursements, costs and expenses, before incurred shall have the approval of both Licensor and Licensee. In the event Licensor and Licensee does not approve of suit or of a particular disbursement, cost or expense, the other party may in its discretion, at its own expense, proceed with such suit or expenditure. The disbursements, costs and expenses of such suit, when so approved, shall be borne equally by

the Licensor and Licensee and any contribution by Arthur Oppenheimer, Jr. shall be credited to such disbursement, costs and expenses."

At this point in their briefs, both counsel are poles apart in their treatment of these clauses. The Government describes the grant by Comfy to Sure-Fit as a "nonexclusive license" and the defendants give it the appellation of "exclusive license". Upon this major premise, each respective conclusion is irrefutable. The Government's argument stems from Crown Die and Tool Company v. Nye Tool & Machine Works, 1923, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516. In that case, the plaintiff, who sought to enjoin an alleged infringement of a screw-threaded cutting device, claimed as the basis of his right to sue an assignment from the patentee which granted him no other rights under the patent. Mr. Chief Justice Taft, discussing at great length the rights of a patentee under our Federal Patent Laws, concluded that the right to make, use and vend an invention are rights derived from common law, as based on natural law, and that all the Government grants a patentee is the right to exclude others from making, using or vending his invention. He reasoned, however, that this right to exclude others is not assignable in and of itself, for it is merely an incident of the common law right to make, use and vend, and that the incident of exclusive enjoyment is government protected only if a person (patentee or assignee) has also the right itself. A licensee, though he does not have legal title, also acquires the incident of exclusive enjoyment, which right is coextensive with whatever right to make, use or vend he may have. It follows that although a licensee cannot sue in his own name where he has a license to be the exclusive maker, user, or vendor under a patent (an exclusive licensee), he has the power to compel the patentee to protect his incident of exclusive enjoyment and he may thus join the patentee in a patent infringement suit. Independent Wireless Telegraph Company v. Radio Corporation of America, 1926, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357, opinion by Chief Justice Taft. Western Electric Co., Inc., v. Pacent Reproducer Corp., 2 Cir., 1930, 42 F.2d 116, applies this same rule where the licensee was granted all rights under the patent, except for a reservation of the right to practice the invention on the part of the licensor. The court still termed such a holder an "exclusive licensee". Thus, under Patent law, where one is an "exclusive licensee" he has a right to exclude others as an incident of patent monopoly and he does not run afoul of the Antitrust laws.

Here, the defendants claim that Sure-Fit is an "exclusive licensee" because the licensing agreement granted to Sure-Fit all rights under the Oppenheimer patent save the right which Comfy reserved for itself. This being so, it is contended that they could legally spell out in the agreement that which the law otherwise allows. With this I must agree. But, it is to be remembered that Comfy was not the patentee of the Oppenheimer patent; it was an assignee. We must, therefore, look to see what rights were vested in Comfy for, if it did not have the power to grant Sure-Fit an exclusive license, the defendants' argument is of no avail.

Under date of October 20, 1937, Oppenheimer and Comfy entered into an agreement whereby Oppenheimer assigned his then pending patent to Comfy; this agreement contained 19 numbered paragraphs which covered six double-spaced typewritten pages. The agreement contained provisions for royalties, the keeping of records and accounts, infringement suits, assignments by Comfy to third persons, licensing by Comfy of third persons and the automatic reassignment of the patent under certain conditions. On January 17, 1938, Oppenheimer, for the recited consideration of One Dollar, signed a single page written agreement, termed, "Assignment", which was recorded in the United States Patent Office in accordance with patent law requirements. The agreement of October 20, 1937 was referred to in this instrument. The provision covering licensing is contained in Paragraph 11 of

the Oppenheimer-Comfy agreement and it reads:

"Comfy shall have the right to grant unto other nonexclusive, non-assignable licenses to make and sell such slip covers, but all such licenses shall be subject to the terms of the agreement and Comfy shall be responsible for payment unto Oppenheimer by such licensees the royalties mentioned in Paragraph 4 herein."

The Government contends that because of this provision Comfy had no power to grant an "exclusive license" to Sure-Fit when it entered into the agreement with Sure-Fit; the power was given to Comfy and the rights to Sure-Fit, because of Oppenheimer's joinder in the latter agreement, which to that extent abrogated the October 20th Oppenheimer-Comfy agreement. The defendants take the position that the assignment by Oppenheimer to Comfy was effected by the agreement of January 17, 1938, the "Assignment" which is recorded, and not by the prior agreement. With this I cannot agree. As between the parties, the statutory requirement of recording is of no consequence. Where there are no intermediary interests affected, recordation has no bearing on the results of a suit; Hook v. Hook & Ackerman, Inc., 3 Cir., 1951, 187 F.2d 52. No particular form is required for the assignment of a patent interest and patent assignments are subject to the same rules of construction that apply to contracts generally, the intention of the parties being of primary concern in construing them; Crosley Radio Corporation v. Dart, 6 Cir., 1947, 160 F.2d 426. The agreement of January 17, 1938 does not stand alone; the defendants cannot be heard to say that the limitation on licensing is without effect any more than they could avoid the paying of royalties by using the same reasoning. The only remaining question is the effect of the limitation on licensing. As part of the agreement between Oppenheimer and Comfy it must be given effect; does this, however, have the effect of reducing Comfy to something less than an as-signee? I think not. Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 335, 34 L.Ed. 923, the leading case on the subject of patent assignments and licenses, establishes the principle that the "exclusive right to make, use, and vend the invention or discovery" is one entire thing and cannot be divided by law. "The patentee or his assigns may, by instrument in writing, assign, grant, and convey, either (1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of the United States. * * * Any assignment or transfer, short of one of these, is a mere license * * *." The case also points out that whether the interest transferred is an assignment, or a license, does not depend upon the name by which it is called, but upon the legal effect of its provisions. There is no limitation that an assignment must be made in or by one written instrument. An assignment is not invalidated because there is a reservation of royalty; Rude v. Westcott, 130 U.S. 152, 9 S.Ct. 463, 32 L.Ed. 888; and, Evans v. Kavanagh, D.C.E.D. Mich.1949, 86 F.Supp. 535, held a transfer of patent rights to be an effective assignment even though it was coupled with a licensing back provision with the power to assign such license to one other person. I think that although the provisions of the Oppenheimer-Comfy agreement may be one step more removed than the Evans case, it is still within the doctrine of the Waterman case. Comfy is therefore an assignee. Thus, when viewed as a whole, as indeed it should be under United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, the Court notes here a situation where no one, the patentee, the assignee, or the licensee, can create any rights under the patent in any other person without the consent of the other two. The owner of the patent and the two dominant manufacturers in the trade have so bound themselves. Although these facts are not identical with those

in United States v. Besser Mfg. Co., D.C. 1951, 96 F.Supp. 304, affirmed 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063, I think the evil which the court there struck down exists here, namely, (1) the veto power over licensing rights granted to a licensee and (2) the contractual arrangement which created the power to restrict competition by requiring joint consent before others could be licensed.

From what has been said before, it is clear that all of the parties hereto, including Oppenheimer and Katzner, were actively engaged in a conspiracy to assure continued domination of the slip cover market in the United States. Katzner, as various exhibits disclose, was closely associated with almost every action taken to effectuate the conspiracy and was particularly active in the maintaining of retail prices. Oppenheimer's activities in the conspiracy were not nearly as pronounced as that of the other five defendants but nevertheless formed a necessary part of the whole. He readily acquiesced in reduction of patent royalties whenever necessary to end litigation which would determine the validity of the patent. Furthermore, he contributed to the legal expenses involved in the harassing suits and in one instance contributed substantially toward defendant Rosner's legal fees to avoid a real test of his own patent.

The assertion of the defendants that in granting this motion the Court is depriving them of the opportunity of establishing by way of defense the factual defenses alluded to before including the statement "that any patent infringement suits threatened or brought by the defendants against retailers and manufacturers were not threatened or brought for the purpose of harassing competitors" is without merit. No defendant has denied the doing of the acts of which there is documentary proof in the record. No defendant has undertaken to deny the existence of expressed attitudes in letters between themselves which reflect their respective understandings of the agreement. The attitudes referred to in the preceding statement cover maintenance of retail prices; threats of patent infringe-

ment suits to keep competitors from doing business with large establishments such as Sears Roebuck and Company and Montgomery Ward and Company; the advisability of suing retailers only; the advisability of settling suits to avoid the ultimate test of the worth of the patent, its validity; and the payment of attorneys' fees of their competitors in the industry. With every document admitted as genuine, it would be futile for the defendants at this late date to attempt to explain away the contents of documents which so clearly express the actual business transactions of the respective defendants.

### Conclusion

That the defendants in combination controlled the market and had the ability to and did drive competitors from the business of manufacturing knitted fabric slip covers is abundantly clear from the record. That the defendants in combination fixed and maintained prices is likewise crystal clear. That the defendants in combination and cross-licensing created a situation in the industry which, particularly by agreement for joint action respecting the patents, effectively hindered newcomers in the field, is also established beyond peradventure of doubt. That the harassing suits against competitors, previously discussed in some detail, were designed as and were actually only harassing suits is clear from an examination of the correspondence between the parties and the Court feels that such conclusion is inescapable from an objective analysis of the documents. All of these actions taken in concert constitute a clear violation of the Sherman Anti-Trust Act and the Government has established to the satisfaction of the Court that the combination and conspiracy above referred to represents an unreasonable restraint of trade and commerce among the several states of the United States in the manufacture and sale of ready-made furniture slip covers, is unlawful, and in violation of Section 1 of the Sherman Anti-Trust Act. Further, the Government, in the opinion of the Court, has effectively demonstrated that the defendants combined and con-

spired not only to restrain trade unreasonably but also to monopolize trade and commerce among the several states of the United States in the manufacture and sale of ready-made furniture slip covers, in direct violation of Section 2 of the Sherman Anti-Trust Act. The Court also feels that by documentary proof the Government has established that the defendants have used patent rights unlawfully in instituting, effectuating and maintaining the aforesaid combination and conspiracy which likewise constitutes a clear violation of the Sherman Anti-Trust Act.

Since the Court holds that the Government is entitled to relief, the question as to the extent of the relief required to eliminate the practices complained of will require further consideration by the Court. The Government will present a proposed form of decree within 40 days from the date of this opinion to which the defendants may file objections or exceptions within 20 days thereafter. The Court will then hold an open hearing as to the form of the decree to be finally entered and thereafter will issue its final order.