In re **PENN CENTRAL COMMERCIAL PAPER LITIGATION.**
No. **MDL–56A.**

United States District Court,
S. D. New York.
Nov. 29, 1973.

See also D.C., 358 F.Supp. 284.

Spruill, Trotter & Lane, Rocky Mount, N. C. (James R. Trotter, Rocky Mount, N. C., of counsel), Lans, Feinberg & Cohen, New York City (Robert S. Cohen, New York City, of counsel), for plaintiffs.

Sullivan & Cromwell, New York City (William Piel, Jr., Michael M. Maney, Philip L. Graham, Jr., Alan M. Reinke, New York City, of counsel), for defendant and third-party plaintiff Goldman, Sachs & Co.

Sullivan & Cromwell, New York City (Michael A. Cooper, New York City, of counsel), for the Witness William J. Williams, Jr.

## OPINION

EDELSTEIN, Chief Judge:

The instant controversy arose during pretrial proceedings in the Penn Central Commercial Paper Litigation (MDL–56A). This litigation involves a number of cases consolidated for pretrial purposes before this court by the Judicial Panel on Multidistrict Litigation, 28 U.S.C. § 1407 (1970). The principal defendant is Goldman, Sachs & Co. (Goldman, Sachs). It sold approximately $80,000,000 of Penn Central Transportation Company (PCTC) commercial paper to the public on various dates between November 1969 and May 1970. Approximately sixty-three entities (institutions, individuals, and trustees) held outstanding PCTC paper on June 21, 1970, the date on which the issuer filed a petition for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1970). This outstanding commercial paper was not redeemed or oth-

erwise paid at maturity. Subsequently, various purchasers, including movants herein, brought suit against Goldman, Sachs grounded on violations of the anti-fraud provisions of the Federal Securities Acts.[1]

Plaintiffs Thorpe & Ricks, Incorporated; A. C. Monk & Company, Inc. and Clinton Mills, Inc. (the Carolina plaintiffs) have moved pursuant to Fed.R. Civ.P. 37(a) for an order to compel William J. Williams, Esq., a witness to: (1) answer certain questions propounded to him during a deposition upon oral examination conducted under Fed.R.Civ.P. 30 and (2) produce for their inspection and copying certain documents. The documents demanded are: (a) a copy of the transcript of the testimony given by this witness before the Securities and Exchange Commission (SEC); (b) paper writings furnished to the SEC in connection with this testimony; and (c) copies of all printer's proofs of offering circulars for two proposed debenture offerings by certain subsidiaries of the Penn Central Company. The pending motion resulted from "special issue discovery"[2] conducted by the Carolina plaintiffs rather than coordinated discovery on behalf of all plaintiffs consolidated before this court in MDL–56A.

A brief discussion of the context in which the instant motion arose may be helpful in understanding the issues raised. William J. Williams, Jr., the witness, at all times relevant to this case, was a partner in the law firm of Sullivan & Cromwell. Sullivan & Crom-

well was at all relevant times general counsel to The First Boston Corporation (First Boston) and rendered legal services to it in connection with many underwritings of public and private offerings of securities. In the fall of 1969 First Boston and Glore Forgan Wm. R. Staats, Inc. (Glore Forgan) were the managing underwriters of a $50,000,000 Pennsylvania Company (Pennco)[3] 9% Sinking Fund Debenture Offering. Sullivan & Cromwell represented the managing underwriters in regard to this offering. John F. Arning, Esq. was the Sullivan & Cromwell partner in charge of this matter. Allegedly, the witness, Williams, was "only peripherally involved" in this offering. Goldman, Sachs, the principal defendant in these cases, was, however, a member of the underwriting syndicate[4] for this offering.

In early 1970 Penn Central sought additional financing through two proposed debenture offerings. The first was a proposed offering of $100,000,000 principal of ___% Sinking Fund Debentures of Pennsylvania Company (the proposed domestic offering). The managing underwriters of this proposed offering—First Boston, Glore Forgan and Salomon Brothers & Hutzler (Salomon Brothers)—retained Sullivan & Cromwell to do the legal work in connection with this offering. The second was a proposed offering of $20,000,000 principal amount of ___% Debentures of Penn Central International N.V., a wholly-owned Netherlands Antilles subsidiary of Penn Cen-

---

1. Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*, 77q (1970); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970) and rules and regulations promulgated thereunder.

2. Paragraph 8 of Pretrial Order No. 2 provides for special-issue discovery by counsel in their respective individual actions. Additionally, it provides that coordinated discovery shall have priority over any special issue discovery unless agreed to by liaison counsel or ordered by the court.

3. Pennco is a wholly owned non-railroad subsidiary of the Penn Central Transportation Company (PCTC), which is the Penn Central entity that operates the railroad. Pennco is a holding company for most of the Penn Central non-railroad assets. *See* SEC, The Financial Collapse of the Penn Central Company 47 (1972) [hereinafter cited as SEC Report].

4. For an exhaustive account of the investment banking business see United States v. Morgan, 118 F.Supp. 621, 635–655 (S.D.N. Y.1953) (per Medina, Circuit Judge).

tral Company, which debentures were to be unconditionally guaranteed as to payment of principal, premium, if any, and interest by Penn Central Company (the proposed international offering). Sullivan & Cromwell was also retained by the prospective managing underwriters[5] of the proposed international offering. Arning was responsible for the legal work on the proposed domestic offering; Williams was in charge of the proposed international offering. Since the offering circulars for both proposed offerings might contain some of the same material, Arning and Williams worked in "close collaboration." Furthermore, Williams acknowledged that he "attended certain meetings having to do principally with the domestic offering when . . . Arning was unavailable and substituted for him as partner in charge of that offering during a vacation which [Arning] took from March 21 to April 6, 1970." As a result of their work on the proposed offerings, Arning and Williams concluded that financial information about the railroad should be included in the offering circular for the proposed Pennco offering.

Goldman, Sachs accepted an invitation to become a member of the prospective underwriting syndicates for both proposed debenture offerings. It was not, however, one of the managing underwriters with respect to either offering. Sullivan & Cromwell was general counsel to Goldman, Sachs during this entire period and is currently representing Goldman, Sachs in the instant litigation. It is asserted that Goldman, Sachs never consulted Sullivan & Cromwell with respect to the two proposed debenture offerings and received no legal advice from Sullivan & Cromwell with regard

to these matters except to the extent that legal opinions of counsel for the prospective managing underwriters were addressed to all members of the underwriting syndicates. It was admitted, however, that Messrs. Arning and Williams represented Goldman, Sachs, as did other Sullivan & Cromwell lawyers, regarding offerings by Goldman, Sachs wholly unrelated to the proposed debenture offerings discussed above.[6]

The proposed debenture offerings were postponed and ultimately abandoned. SEC Report, note 3 *supra*, at 118–119. After June 21, 1970, the date on which PCTC filed its petition for reorganization, numerous suits by holders of Penn Central stock and commercial paper were filed in various district courts throughout the nation.[7] Additionally, the SEC undertook a private investigation into the affairs of the Penn Central Company and its complex of subsidiaries and affiliates. This investigation conducted pursuant to Section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u (1970), was aimed at determining whether any provisions of the Act and of the rules and regulations promulgated thereunder had been violated and whether any legislative or administrative changes were indicated as a result of the Penn Central experience. Several representatives of the prospective managing underwriters of the proposed debenture offerings were subpoenaed to testify before and produce documents to the SEC in connection with its investigation.

In September 1971, the Commission staff contacted Michael A. Cooper, Esq., a Sullivan & Cromwell partner, to inform him that they wanted Messrs. Arning and Williams to testify and pro-

5. Pierson, Heldring & Pierson; First Boston; Glore Forgan; N. M. Rothschild & Sons and R. W. Pressprick & Co., Incorporated.

6. Letter of June 1, 1973 from Michael M. Maney, Esq., a Sullivan & Cromwell partner representing Goldman, Sachs in the commercial paper litigation, to one of my law clerks.

7. *See, e. g.,* In re Penn Central Securities Litigation, MDL-56 (E.D.Pa.); Newton v. Allegheny Corp., 71 Civ. 3800 (S.D.N.Y.); Feldman v. Chase Manhattan Bank, N.A., 71 Civ. 1963 (S.D.N.Y.); Dura-Bilt Corp. v. Chase-Manhattan Corp., 70 Civ. 4666 (S.D. N.Y.).

duce documents before the Commission. Sullivan & Cromwell acceded to this request. Williams explains their reason for doing so as follows:

> We, of course, notified representatives of our clients, the prospective managing underwriters of the two offerings, that the Commission had requested us to appear and informed them that the Commission had apparently already received testimony concerning a meeting at the offices of Sullivan & Cromwell on March 31, 1970, attended by senior officers of First Boston, Glore Forgan, Salomon Brothers and Pierson, Heldring and by Arthur H. Dean, then senior partner of our firm, and myself. Inasmuch as the Commission staff appeared to have an incomplete and somewhat distorted picture of what had transpired at that meeting, *we advised our clients that it might be in their best interest to waive the attorney-client privilege concerning the discussions at the meeting*, at least to the extent of permitting us to appear, testify and produce documents to the SEC for purposes of its investigation (emphasis added).

Arning and Williams appeared before the SEC and gave testimony concerning the meeting between senior representatives of the managing underwriters and the Sullivan & Cromwell lawyers working on the two proposed offerings. A portion of Williams' testimony was published in the SEC Report. *See* note 3 *supra,* at 113–14. Additionally, the report summarizes other testimony given by Williams and includes an excerpt from a memorandum prepared by Williams for Arthur H. Dean, Esq., who was then the senior partner of Sullivan & Cromwell. From an examination of the SEC Report, it appears that Williams' testimony focused on the continuing financial deterioration of the Penn Central complex.

The Carolina plaintiffs deposed Williams as to "matters learned and things done by him in the spring of 1970 relative to [the] two proposed (but subsequently abandoned) offerings of securities . . . ." Williams was represented by counsel at the deposition and he answered most of the questions propounded by counsel for plaintiffs. He refused, however, to answer certain questions [8] or to produce any of the documents requested by plaintiffs.[9]

The general scope of discovery is governed by Fed.R.Civ.P. 26(b), which provides in relevant part:

> Parties may obtain discovery regarding any matter, not privileged,

---

**8.** In this affidavit, submitted in opposition to the instant motion, Williams describes those questions that he refused to answer as follows:

(a) questions concerning conversations and events occurring after March 19, 1970, which Mr. Maney represented was the date of the last order placed by any of the Carolina Plaintiffs for the purchase of commercial paper of Penn Central Company . . . ;

(b) questions concerning conversations which I had with representatives of my clients, the prospective managing underwriters, which conversations I was advised and myself believe were immune from discovery by virtue of the attorney-client privilege and as to which that privilege had not been waived by my clients . . . ;

(c) questions concerning discussions solely between Mr. Arning and myself in

carrying out our responsibilities as counsel to the prospective managing underwriters of the two proposed offerings . . . ; and

(d) questions concerning the workings of my mind, such as whether an event gave me "concern" . . . and whether at a given point of time I had "concluded" that there was a "significant" "risk" that Penn Central Transportation Company might be in bankruptcy within the succeeding year or two . . . .

Plaintiffs contend that the witness also refused to respond to questions "as to whether the attorney-client privilege was asserted by anyone in connection with the paper writings furnished the S.E.C. at the time of his testimony."

**9.** For a list of these documents see p. 456, *supra.* For a discussion and analysis of these documents see pp. 466–468, *infra.*

which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . . It is *not* ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Plaintiffs urge that the testimony of Williams is either relevant or reasonably calculated to lead to the discovery of admissible evidence in two respects. First, it is asserted that knowledge regarding Penn Central and its subsidiaries gained by Williams in the course of his work on the two proposed offerings can be imputed to Goldman, Sachs, the defendant herein, as a matter of law. Plaintiffs develop this argument as follows: The witness Williams is an attorney and a member of Sullivan & Cromwell. Defendant (Goldman, Sachs) is, and at all relevant times was, a client of Sullivan & Cromwell. Sullivan & Cromwell was counsel to the prospective managing underwriters on the two proposed debenture offerings. Goldman, Sachs accepted an invitation to become a member of the underwriting syndicates for the two offerings. Hence, plaintiffs conclude that Sullivan & Cromwell became counsel for Goldman, Sachs with respect to the two proposed debenture offerings, and, therefore, knowledge obtained by Sullivan & Cromwell in the course of its work on those offerings can be imputed to defendant in the instant litigation.

In support of this theory, the Carolina plaintiffs cite to 7 Am.Jur.2d Attorneys at Law §§ 107–109 (1963). Three basic principles can be distilled from this authority. First, material information acquired by an attorney within the scope of his employment is imputed to his client.[10] Secondly, notice or knowledge

received by an attorney while working outside the scope of his employment is not imputable to his client unless it was acquired under circumstances closely related to the transaction for which he was engaged and it would violate no duty for him to disclose the matter.[11] Thirdly, knowledge acquired by an attorney while engaged by another client is not imputable to a client when it would violate a professional duty to reveal the matter acquired even if the lawyer is employed by the other client with respect to the same subject matter.[12]

The second basis upon which plaintiffs predicate their relevancy argument is that knowledge acquired by Williams concerning the Penn Central companies "are matters which reasonably could have been learned and known by defendant at or before the time learned and known by Williams had defendant done the things done by Williams in the course of his work on the proposed Pennco offerings."

Defendant controverts both arguments asserted by plaintiffs. Goldman, Sachs alleges that for it to be charged with knowledge acquired by Williams with respect to the two proposed offerings, Sullivan & Cromwell would have had to have been acting as its counsel with respect to these offerings. Defendant argues that since the agreement among underwriters was never consummated, Sullivan & Cromwell did not become its counsel with respect to the two proposed offerings. Defendant asserts that its only connection with the proposed debenture offerings "was a tentative expression of willingness to join an underwriting group *if and when such group were to be formed.*" (emphasis in original).

As to plaintiffs' second argument (*i. e.,* that matters learned by Williams could have been learned by defendant at or before the time learned by Williams) defendant contends that plaintiffs are

---

10. 7 Am.Jur.2d Attorneys at Law § 107 (1963).

11. *Id.* § 108.

12. *Id.* § 109.

attempting to obtain information from Williams that could be obtained from other more direct sources. Although defendant acknowledges that financial information concerning the Railroad, which Williams obtained in the course of his work, might be relevant to this litigation, it asserts that plaintiffs could obtain this information more directly from Penn Central employees.[13] Additionally, defendant submits "that the nature of Mr. Williams' analysis, and his reasons for reaching any conclusions for his client First Boston are not properly discoverable under these circumstances."

■ The imputation of knowledge point was discussed at length by counsel. The court views imputation as going to admissibility. For purposes of discovery, the question of admissibility is disregarded if "the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Generally, if the information sought is relevant to the subject matter of the litigation it is discoverable unless privileged.

■ What is relevant in the context of any litigation is not susceptible to a precise definition. Mallinckrodt Chemical Works v. Goldman, Sachs & Co., 58 F.R.D. 348, 353 (S.D.N.Y.1973). The sweeping scope of Rule 26(b)(1) led one distinguished commentator to suggest that "discovery should be relevant where there is *any possibility* that the information sought may be relevant to the subject matter of the action." C. Wright, Law of Federal Courts § 81, at 359 n.47 (2d ed. 1970) (emphasis added). Viewed in light of this standard it becomes apparent that any information concerning the financial condition of PCTC during the general period in which plaintiffs purchased their notes is relevant to the instant litigation.[14] Relevancy may also be bottomed on a more narrow ground.

The actions currently before the court are predicated, *inter alia,* on defendant's alleged violation of Section 12(2) of the Securities Act of 1933.[15] Plaintiffs

13. Specifically defendant contends:

Every fact concerning which Mr. Trotter [plaintiff's counsel] seeks testimony from Mr. Williams is available from other, more direct sources. Mr. Trotter has participated in the depositions of Jonathan O'Herron, former Vice President-Financial of the Railroad, and has indicated his intention of participating in the scheduled depositions of David Bevan, former Railroad Finance Committee Chairman, Stuart Saunders, former Railroad Board Chairman, and Robert Loder and Raymond Lepley, both high level Railroad financial department employees. Although to our knowledge they have not done so, the Carolina Plaintiffs are also free to inspect documents from the Railroad. Moreover, they can examine the discovery completed to date in Philadelphia in MDL-56, much of which has a direct bearing on the financial condition of the Railroad.

Defendant's Memorandum in Opposition to the Motion to Compel Disclosure at 13.

14. Defendant asserts that any matters learned by Williams after March 19, 1970 are irrelevant. March 19, 1970 was the last trade date on which any of the Carolina plaintiffs purchased paper from Goldman,

Sachs. Hence, defendant argues that March 19, 1970 should be the cut-off date for discovery by the Carolina plaintiffs. The court cannot accept this position for at least two reasons. First, a decision approving the March 19, 1970 cut-off date would represent tacit approval for defendant's contention that in the commercial paper context there is no duty to disclose information to a purchaser after the trade date. Secondly, it may be that matters learned after March 19, 1970 relate to events prior to that date. It should be recalled that this question came up with respect to the June 21, 1970 cut-off date for coordinated discovery. The court endorsed the position of the parties that there should be a relation-back exception to the June 21, 1970 date. *See* In re Penn Central Commercial Paper Litigation, MDL-56A (S.D.N.Y. Feb. 16, 1973).

15. 15 U.S.C. § 77*l*(2) (1970), which provides as follows:

Any person who—

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication

claim that defendant provided them with untrue statements of material fact in the sale of PCTC commercial paper. Additionally, they assert that Goldman, Sachs omitted to state material facts in the course of these sales, thereby rendering other statements that it made misleading. Information claimed by plaintiffs to be untrue and material facts alleged to have been omitted by defendant deal primarily with the deterio-rating financial posture of PCTC at the time of defendant's sales to plaintiffs.[16] Under Section 12(2) Goldman, Sachs can successfully defend against these claims by proving that it did not know and in the exercise of reasonable care it could not have known of the claimed false statements and material omissions.[17]

What, when, and how Williams learned about the financial condition of PCTC may be relevant for plaintiffs in

---

in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), *and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission*, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. (emphasis added).

16. For example, paragraph 22 of the *Clinton Mills* complaint alleges:

(g) That the financial and other information furnished Plaintiff in connection with the sale of the PCTC notes was out of date and did not reflect the serious deterioration that had occurred in PCTC's financial condition and operations since the date of the same and would mislead Plaintiff in evaluating PCTC's financial condition and prospects and in predicating an investment decision in reliance upon the same.

(h) That for some time PCTC had been suffering severe cash shortages and difficulties in obtaining financing to meet its operating expenses, capital improvements and debt maturities.

(i) That for some time PCTC had been unable to obtain long-term debt financing, and had, since at least as early as 1968, become almost completely dependent upon short-term debt financing to sustain its operations and had no present prospects for obtaining long-term financing to finance its continued operations or to refi-nance its maturing short-term debt obligations.

(j) That PCTC had pledged virtually all of its assets to its bank and other creditors and had no significant remaining assets to pledge or otherwise use to obtain further loans or financings or to cover or meet its maturing short-term debt obligations.

(k) That for some time PCTC had been and was using the money which it obtained from the sales of its short-term, unsecured, promissory notes, including the PCTC notes, to refinance maturing long and short term debt obligations and to finance capital improvements previously made rather than for current transactions.

(l) That for some time PCTC had been and was experiencing extraordinarily large and rapidly increasing operating losses, negative cash flows and working capital deficits.

(m) That during 1970 PCTC would have to raise in excess of $200 million to meet its maturing debt obligations and would have to raise other substantial sums to meet its other anticipated expenses and expenditures and that there was no assurance that the same could be raised.

(n) That during the fall of 1969 Defendant had participated in an application by PCTC to the Interstate Commerce Commission seeking approval to issue short-term, unsecured, promissory notes in the course of which the Interstate Commerce Commission and members of its staff expressed serious concern over the heavy dependence of PCTC upon short-term debt financing and its proposed course of debt financing.

(o) That PCTC would not have sufficient funds in hand to pay its outstanding debt obligations and the PCTC notes as the same matured nor assurance that it would obtain funds for such purposes other than from its operations.

17. *See* note 15 *supra*.

rebutting any claim by defendant that it could not in the exercise of reasonable care have learned about the alleged false statements and material omissions. The Carolina plaintiffs' claim that had Goldman, Sachs, with its expertise, done some of the things that Williams did,[18] defendant could have learned about the declining position of the Transportation Company. On the other hand, it may be that the position of Williams as counsel to the prospective managing underwriters was unique, and, therefore, defendant could not reasonably be expected to have undertaken the type of investigation conducted by Williams. Resolution of these problems is unnecessary for purposes of this motion. This analysis demonstrates that matters learned by Williams in the course of his work on the two proposed debenture offerings are relevant to this litigation. The basic discovery provision provides, however, that parties "may obtain discovery regarding any matter *not privileged* . . . . " (emphasis added). Consequently, notwithstanding the establishment of relevancy the court must evaluate whether some or all of the discovery sought by plaintiffs is privileged. If the items sought are privileged the court must then determine whether the privilege has been waived. Before undertaking an analysis of the specific items demanded by plaintiffs, a general discussion of the privilege question seems desirable.

Plaintiffs contend that the failure of Williams to assert the attorney-client privilege before the SEC constitutes a waiver of the privilege. Defendant, on the other hand, maintains that the attorney-client privilege was not waived by Williams' participation in the SEC investigation.

■ Defendant offers two rationales for this conclusion. First, it contends that disclosure in a nonpublic SEC investigation does not waive the attorney-client privilege in later civil litigation. No authority is offered in support of this proposition. Moreover, defendant even acknowledges that the general rule on waiver cuts against this position.[19] Nevertheless, it argues that as a matter of public policy this court should hold that Williams' appearance before the SEC should not be deemed to have waived the privilege for purposes of this litigation. Otherwise, it is contended that parties will be reluctant to cooperate with government authorities in such investigations.[20]

The second argument is that Williams' client, First Boston, never made an unequivocal waiver with respect to the testimony given or documents produced by

18. Williams stated that he had no formal training as a financial analyist. Deposition Transcript at 6–7.

19. *See* 8 J. Wigmore, Evidence § 2327 (McNaughton rev. 1961).

20. Defendant points to the regulations that insure privacy in non-public SEC investigations, 16 C.F.R. § 203.6, as support for its assertion that "a limited disclosure to the SEC staff lawyers alone should not be viewed as a general waiver of the privilege." It should be noted that these regulations are for the benefit of the Commission and not for witnesses who may appear before it. *See* LaMorte v. Mansfield, 438 F.2d 448, 450–451 (2d Cir. 1971).

Additionally defendant cites to Bucks County Bank & Trust Co. v. Storck, 297 F. Supp. 1122 (D.Hawaii 1969) as analogous authority lending support to its public policy argument. In the *Bucks County* case plaintiff sought discovery of privileged matter from the defendant-attorney on the ground that his client, a co-defendant in the suit, had waived the privilege by testifying regarding the privileged matters at a prior proceeding. The co-defendant-client's earlier testimony had been given in relation to a motion to recover property taken from him during an allegedly illegal search and seizure. The court held that the earlier testimony did "not constitute a general waiver of the privilege by the client . . ." because it had only been given for purposes of motion to return the property. *Id.* at 1123. The court did not support this conclusion with any authority. Hence, *Bucks County* lends only slight support to defendant's contention.

Williams. It only consented to a limited waiver for purposes of the SEC investigation. Defendant asserts that the intent of the client is the critical element in determining whether a waiver has been effectuated. Additionally, defendant seems to imply that a waiver for a "very limited purpose—that of aiding the SEC's role as guardian of the public interest . . . is simply not the kind of 'disclosure' which constitutes a waiver of the attorney-client privilege."

[4, 5] Before analyzing whether the Williams' participation in the SEC investigation effectively waived the attorney-client privilege, it is important to examine the propriety of taking the deposition of an attorney for a party to an action. It is well established that an attorney for a party may be deposed. *See, e. g.,* United States v. Anderson, 34 F. R.D. 518, 522 (D.Colo.1963) ("[T]hat one is an attorney creates no immunity from depositions"); McCall v. Overseas Tankship Corp., 16 F.R.D. 467 (S.D.N. Y.1954); Sagorsky v. Malyon, 12 F.R.D. 486 (S.D.N.Y.1952); Goldberg v. Travelers Fire Ins. Co., 11 F.R.D. 566 (S.D. N.Y.1950); Jenkins v. Pennsylvania R. R. Co., 9 F.R.D. 297 (E.D.N.Y.1949); 4A J. Moore, Federal Practice ¶ 30.51 & n.11 (2d ed. 1970). Nevertheless, it is also well settled that discovery from an attorney is proscribed regarding matters as to which the attorney-client privilege may be invoked. *See, e. g.,* Sagorsky v. Malyon, 12 F.R.D. 486 (S.D.N.Y.1952), in which Judge Weinfeld sustained the right to depose counsel for a party "subject to the right of the attorneys to claim the attorney-client privilege where

required during the course of the examination." *Id.* at 487. Additionally, courts have endeavored to protect an attorney against whom discovery is sought from harassment. *See* Goldberg v. Travelers Fire Ins. Co., 11 F.R.D. 566, 567–568 (W.D.N.Y.1950).

█ It is clear that any communications between Williams and his clients —the prospective managing underwriters on the proposed debenture offerings —are immune from discovery under the attorney-client privilege. Any such communication appears to fall within the ambit of the privilege as set out by Judge Wyzanski in United States v. United Shoe Machinery Corp., 89 F. Supp. 357 (D.Mass.1950), which is generally regarded as a leading case in the field. The elements required for claiming the privilege, as articulated by Judge Wyzanski, are set out in the margin.[21] The question for this court to resolve is whether Williams' participation in the SEC hearing waived the privilege with respect to documents he produced and as to matters on which he gave testimony.

The court finds that the attorney-client privilege was waived by the appearance of Williams before the SEC. The weight of authority unequivocally contradicts the position on nonwaiver asserted by defendant. It is hornbook law that the voluntary disclosure or consent to the disclosure of a communication, otherwise subject to a claim of privilege, effectively waives the privilege. *See* C. McCormick, Evidence § 97 (1954). This view is universally shared by both the

---

21. The requisite elements are as follows:
The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication in acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.
United States v. United Shoe Mach. Corp., 89 F.Supp. 357, 358–359 (D.Mass.1950).

courts [22] and leading commentators.[23] The theoretical predicate underlying all recognized privileges [24] is that secrecy and confidentiality are necessary to promote the relationship fostered by the privilege. Once the secrecy or confidentiality is destroyed by a voluntary disclosure to a third party, the rationale for granting the privilege in the first instance no longer applies.[25]

In the case at bar it was acknowledged that Williams' client voluntarily waived the attorney-client privilege with respect to Williams' appearance before the SEC. No claim was made either by counsel to defendant herein, or by counsel for Williams that this waiver was not voluntary or that it was made without opportunity to claim the privilege. Accordingly, the court must reject defendant's contention that the kind of disclosure that we are confronted with —*i. e.*, one made during a nonpublic SEC investigation—does not effect a waiver of the attorney-client privilege.

■■■ Defendant's public policy argument must also be rejected. Although it is probably correct to assume that a witness would be less likely to cooperate with authorities if his testimony, given in a nonpublic proceeding, is subject to discovery in later civil litigation, this *factor alone is an inadequate basis for a court to break new legal ground against* the overwhelming weight of authority. Moreover, it is well settled that a claim of privilege cannot be selectively waived [26]. To allow Williams to assert the attorney-client privilege in the instant litigation would permit selective waiver of the privilege. Consequently, defendant's argument that First Boston did not waive the privilege except for purposes of the SEC proceeding is unpersuasive.

Having resolved the attorney-client privilege issue, it is now appropriate to rule on the specific items demanded by the instant motion. Plaintiffs have requested the right to inspect and copy the transcript of Williams' testimony before the SEC. They bottom this request on a stipulation between the parties to exchange transcripts of testimony before the SEC in connection with the Commission's investigation of *defendant*. Additionally, they cite to Zients v. LaMorte, 319 F.Supp. 956 (S.D.N.Y.1970), manda-

---

**22.** *See, e. g.,* United States v. Jacobs, 322 F. Supp. 1299, 1303 (C.D.Cal.1971) ; Radio Corp. of America v. Rauland Corp., 18 F.R. D. 440, 443–444 (N.D.Ill.1955) ; Connecticut Mutual Life Ins. Co. v. Shields, 18 F.R.D. 448, 451 (S.D.N.Y.1955) ; United States v. Kelsey-Hayes Wheel Co., 15 F.R.D. 461, 464–465 (E.D.Mich.1954) ; Magida on Behalf of Vulcan Detinning Co. v. Continental Can Co., 12 F.R.D. 74, 77 (S.D.N.Y.1951) ; Wild v. Payson, 7 F.R.D. 495, 500 (S.D.N.Y. 1946).

**23.** *See, e. g.,* C. McCormick, Evidence § 97 (1954) ; 8 J. Wigmore, *supra*, note 19.

**24.** *See* Note, First Amendment Protection of the News Media : Caldwell v. United States, 3 Rutgers Camden L.J. 46, 55–56 (1971).

**25.** This is the position taken by the Advisory Committee to the recently proposed Federal Rules of Evidence. *Advisory Committee's Note to Rule 511*—Waiver of Privilege by Voluntary Disclosure, which in pertinent part provides as follows : "The central purpose of most privileges is the promotion of some interest or relationship by endowing it

with a supporting secrecy or confidentiality. It is evident that the privilege should terminate when the holder by his own act destroys this confidentiality." *Id.*

**26.** *See, e. g.,* Lee National Corp. v. Deramus, 313 F.Supp. 224, 227 (D.Del.1970) ("It would be patently unfair for a client to disclose those instances which please him and withhold all other occasions.") ; United States v. Krasnov, 143 F.Supp. 184, 191 (E.D.Pa.1956), aff'd per curiam, 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957) ("The privilege once waived cannot be regained . . . .") ; United States v. Kelsey-Hayes Wheel Co., 15 F.R.D. 461, 464–465 (E.D.Mich.1954) ("If the client waives the privilege at a first trial, he may not claim it at a subsequent trial, because after the first publication the communication is no longer confidential and there is no reason for recognizing the privilege.") ; United States v. Shibley, 112 F.Supp. 734, 742 (S.D.Cal.1953) ("[W]hen the client and attorney themselves, for purposes beneficial to the client, lift the veil, they cannot lower it again.").

mus denied, LaMorte v. Mansfield, 438 F.2d 448 (2d Cir. 1971) as authority supporting their request. Plaintiffs' reliance on both the stipulation referred to and the *Zients* case is misplaced.

The stipulation is embodied in Pretrial Order No. 4, which in relevant part provides as follows:

> The plaintiffs in MDL–56A and defendant Goldman, Sachs & Co. agree to exchange . . . all transcripts of testimony taken by the Securities and Exchange Commission ('the SEC') and all affidavits and documents given to the SEC in connection with the investigation by the SEC of the sales by Goldman, Sachs & Co. of commercial paper of Penn Central Transportation Company . . . .

■ Defendant contends that this stipulation is inapplicable to the instant controversy in at least two respects. First, the stipulation explicitly refers to transcripts and documents of parties to this litigation. Williams is not a party to this controversy and the transcript of his testimony was never in the custody or control of defendant, Goldman, Sachs. Therefore, defendant asserts that the transcript falls outside the ambit of Pretrial Order No. 4. Secondly, defendant points out that the stipulation only covers that portion of the SEC investigation pertaining to the sale of PCTC commercial paper by Goldman, Sachs. It is asserted that Williams never represented Goldman, Sachs with regard to any of its commercial paper transactions and that except for one question[27] he was neither asked nor did he give any testimony concerning the sale of commercial paper by defendant. Accordingly, it is contended that the subject matter of Williams' testimony is outside the scope of the stipulation.

Defendant's arguments are well taken. It seems clear that plaintiffs cannot bottom their request for the transcript of Williams' testimony on Pretrial Order No. 4.

■ Plaintiffs' reliance on Zients v. LaMorte, 319 F.Supp. 956 (S.D.N.Y. 1970), mandamus denied, LaMorte v. Mansfield, 438 F.2d 448 (2d Cir. 1971) as authority mandating production of Williams' transcript is also misplaced. This case stands for the proposition that the SEC confidentiality rules, which are utilized in nonpublic investigations, are for the benefit of the Commission and cannot be invoked by a witness to thwart discovery of his testimony if the witness is allowed to obtain a transcript of his testimony without prohibition against its disclosure to third parties. *See also* In re Four Seasons Securities Laws Litigation, 54 F.R.D. 527 (W.D. Okl.1972); White v. Jaegerman, 51 F. R.D. 161 (S.D.N.Y.1970). Here there has been no claim that the witness (Williams) was prohibited from disclosing the transcript to third parties. In fact, the Commission itself has disclosed a portion of Williams' testimony in its Staff Report.[28] Whether the transcript is discoverable in the instant proceeding is determined by testing plaintiffs' demand under the applicable discovery provisions of the federal rules.

---

**27.** During his deposition, Williams was asked whether "During the course of your testimony before the Securities and Exchange Commission, did you respond to any questions concerning Goldman Sachs?" He responded as follows: "I was asked whether we had, in the course of our investigation, consulted with dealers in commercial paper of the railroad, and responded that I had not." Deposition Transcript at 21.

**28.** It should be noted that the Commission could have published Williams' testimony in its entirety. Additionally, even if we assume arguendo that the disclosure to the SEC did not waive the privilege, the subsequent publication by the SEC of part of Williams' testimony effectuates a waiver. 8 J. Wigmore, *supra* note 19, § 2327, at 638 ("The client's offer of his own or the attorney's testimony as to a *specific communication* to the attorney is a waiver as to all other communications to the attorney on the same matter.") (emphasis in original). *See also* C. McCormick, *supra* note 23, § 97, at 197 & n. 5.

Fed.R.Civ.P. 34(c) specifically contemplates discovery of documents and things from persons not parties to an action.[29] Such discovery may be had by a subpoena *duces tecum* pursuant to Fed.R.Civ.P. 45(b). *See* 8 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2204, at 594, § 2209 (1970). Plaintiffs in the instant matter have invoked this procedure in seeking documents from the nonparty witness (Williams).

We have previously established that the subject matter of Williams' testimony is relevant to the instant action. It has also been established that some of Williams' testimony may be privileged. The court has found, however, that the privilege was waived by Williams' voluntary appearance and disclosures to the Commission. Consequently, plaintiffs are entitled to inspect and copy the transcript of Williams' SEC testimony.

Plaintiffs' motion requests production of four documents submitted to the SEC in connection with Williams' testimony. These documents are: (1) a memorandum prepared by Williams addressed to Mr. Dean; (2) a draft introduction to the offering circular for the proposed domestic offering; (3) a letter dated April 9, 1970 from Williams to Mr. Hans Muntinga of Pierson, Heldring; and (4) a press release of Penn Central Company dated April 22, 1970, reporting first quarter 1970 results of operations.

■■■■■■ Paragraph 16 of Williams' affidavit, submitted in opposition to plaintiffs' motion, describes these documents. Williams averred that the memorandum of March 28, 1970 was "shown to representatives of the prospective managing underwriters . . ." and that it "summarized certain information which [he] had learned about Penn Central Company and related companies while carrying out [his] responsibilities as counsel to the prospective managing underwriters, recounted conversations which [he] had . . . with Penn Central officers and employees and others, and expressed certain assumptions, conclusions and recommendations." Williams indicated that the second document—the draft introduction to the offering circular—bore "marginal questions and comments by Mr. Dean and [himself]." Although Williams did not describe the content of the letter to Mr. Muntinga, the SEC Staff Report quoted from this letter as follows:

> "On Monday afternoon Dave Bevan met with representatives of First Boston, Glore Forgan and Salomon Bros. and proposed that the Penn Central and Great Southwest warrants be eliminated from the Pennco $100,000,000 offering. Fred Smith of First Boston believes that one of Bevan's motives was to avoid the disclosures with respect to Penn Central and the Railroad which he knew, from our draft introduction, we would have required. I think this also enabled Bevan to avoid some rather difficult problems he was encountering with Great Southwest's management and counsel and in getting the Penn Central Common stock into Pennco's hands on a basis satisfactory to all concerned."

SEC Report, note 3 *supra*, at 111 & n. 178. It is evident that these three documents relate to the financial posture of the Penn Central Company and its subsidiaries and affiliates. From our earlier discussion we have concluded that any material related to this subject matter is relevant to the instant litigation. Additionally, it is obvious that these documents would ordinarily be privileged. The privilege that attached to these writings, however, was waived by

---

**29.** Rule 34(c) provides: "This rule does not preclude an independent action against a person not a party for production of documents and things and permission to enter upon land."

their production to the SEC.[30] Underwater Storage, Inc. v. United States Rubber Co., 314 F.Supp. 546, 549 (D.D. C.1970); D'Ippolito v. Cities Service Co., 39 F.R.D. 610 (S.D.N.Y.1965); United States v. Krasnov, 143 F.Supp. 184 (E.D.Pa.1956); aff'd per curiam, 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957). The court in *Krasnov* rejected an assertion of the attorney-client privilege in a context analogous to the situation in the case at bar. There documents had been presented to a grand jury without objection from defendants. The documents were later submitted by plaintiff in support of motion for summary judgment in an antitrust action. Defendants objected to the introduction of these documents on the ground that they fell within the purview of the attorney-client privilege. Rejecting defendants' contention, the court stated: "As to the . . . documents relied upon by the Government, all of which were presented without claim of privilege, any attempt now to invoke the claim cannot be considered. The privilege once waived cannot be regained . . . ." *Id.* at 191. *See also* United States v. Kelsey-Hayes Wheel Co., 15 F.R.D. 461, 464–465 (E.D.Mich.1954). Similarly, in the case under review the documents in question were submitted to the SEC without invocation of the privilege. The privilege, which was previously waived, cannot now be asserted. Accordingly, defendant is directed to turn over the three documents discussed above for inspection and copying by plaintiffs. As to the fourth document —*i. e.*, the press release—produced to the Commission staff during Williams' appearance, there appears to be a difference of opinion between the parties with respect to whether this document was a draft press release or the actual release.[31] If it was the actual press release, the court will deny plaintiffs' request for this document. It seems clear that if this writing was the actual release plaintiffs can obtain a copy from a source other than Williams. The rationale for permitting an independent action for production of documents and things from a nonparty witness presumes a situation in which the items sought are unavailable from a party, *see, e. g.*, Bada Co. v. Montgomery Ward & Co., 32 F.R. D. 208 (E.D.Tenn.1963), or are not otherwise obtainable by the movant's own efforts. *See cf.* Overly v. Hall-Neal Furnance Co., 12 F.R.D. 112 (N.D.Ohio 1951). On the other hand, if the document in question was only a draft, which was never released, defendant is directed to allow plaintiffs the right to inspect and copy it.

The next items demanded by the instant motion are copies of the various printed proofs of the offering circulars worked on by Williams in connection with the proposed offerings. In support of their application for these documents plaintiffs have argued:

> It is believed that the printers proofs of the proposed Pennco offering circulars contains relevant evidence of not only *what* Williams learned in connection with the proposed Pennco offerings but also the times *when* he learned it. Further, by comparing the various drafts of the circulars, the Carolina Plaintiffs can determine the changes made in the proposed offerings and when made. (emphasis in original).

It is clear that the printer's proofs of the offering circulars contain information relevant to this litigation.

---

30. *See* notes 22–25 *supra* and accompanying test.

31. In this affidavit, Williams calls this document "a press release of Penn Central Company dated April 22, 1970 . . . ." Williams Affidavit, ¶ 16, at 8. On the other hand, counsel for plaintiffs, Mr. Trotter, refers to this item as "a *draft* press release with respect to the first quarter 1970 earnings of either Penn Central Company or Penn Central Transportation Company . . . ." (emphasis added). Trotter Affidavit, at 3–4.

Defendant's objection to the production of these materials may be deemed to be on the basis that they constitute the work product of the witness, Williams, and other members and associates of Sullivan & Cromwell. Objection Pursuant to Rule 45(d)(1) to Inspection or Copying of Subpoenaed Materials at 2.[32] An item is not work product simply because its author is a lawyer. To qualify for the special immunity extended to work product, an item must fall within the framework of Fed.R.Civ.P. 26 (b)(3).[33] There are two readily discernible criteria under the rule. First, the item must be "prepared in anticipation of litigation or for trial," and, secondly, it must be prepared "by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) . . . ." The items in question were prepared for the prospective managing underwriters of the proposed debenture offerings. Moreover, the offering circulars were not prepared in anticipation of this litigation. Consequently, these documents cannot be considered work product for purposes of this case. Accordingly, defendant is directed to turn over for inspection and copying the requested printer's proofs of the offering circulars.

The last item for the court's consideration is plaintiffs' application for an order to compel Williams to answer: (i) questions that he refused to answer previously, and (ii) additional questions to be propounded at a continuation of his deposition. This branch of plaintiff's motion will be denied without prejudice. A further deposition of Williams may be unnecessary in light of the other items ordered disclosed by this opinion.

Reviewing the rulings on plaintiff's motion, the court grants the request for (a) the transcript of Williams' SEC testimony; (b) three of the four documents produced to the SEC in connection with his appearance; and (c) copies of the printed proofs of the offerings circulars. The application for a continuation of Williams' deposition is denied without prejudice. As to the fourth document demanded—*i. e.*, the press release or draft press release—if it was publicly available, the demand for production is denied. But if it was never released then the application is granted.

So ordered.

---

32. It should be noted that in its papers opposing the instant motion, defendant never specifically addressed itself to plaintiffs' request for the printer's proofs of the offering circulars. At oral argument, however, counsel for Williams asserted "that a proof representing a lawyer's intermediate thought like the draft of a brief, it is his handwritten manifestation of the processes through which he is going before he is prepared to have a document submitted to the public, to a regulatory agency or to the Court, [and] that . . . . process is not appropriate for inquiry in a deposition." Transcript of May 24, 1973, at 40–41.

33. In relevant part, Rule 26(b)(3) provides as follows:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means.